IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

**ENTERED**
**08/26/2015**

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| THEODORE M. HERRING, JR., | ) | CASE NO. 13-32914-H3-7 |
| CARMEN W. DAWSON | ) | |
| | ) | |
| Debtors, | ) | |
| | ) | |
| HERON LAKES ESTATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | ADV. NO. 13-3290 |
| | ) | |
| THEODORE HERRING, JR., | ) | |
| CARMEN W. DAWSON | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

MEMORANDUM OPINION

The court has held a trial of the instant adversary
proceeding.  The following are the Findings of Fact and
Conclusions of Law of the court.  A separate Judgment will be
entered denying the relief requested by the Plaintiff.  To the
extent any of the Findings of Fact are considered Conclusions of
Law, they are adopted as such.  To the extent any of the
Conclusions of Law are considered Findings of Fact, they are
adopted as such.

Findings of Fact

Theodore M. Herring, Jr. ("Herring") and Carmen W.
Dawson ("Dawson"), collectively referred to as "Debtors" or
"Defendants," filed a joint voluntary petition under Chapter 7 of

the Bankruptcy Code on May 9, 2013.  The complaint in the instant adversary proceeding was filed on October 16, 2013.

In the complaint in the instant adversary proceeding, Heron Lakes Estates Owners Association ("Plaintiff") seeks denial of Debtors' discharge, under Sections 727(a)(2), 727(a)(3), 727(a)(4), and 727(a)(5) of the Bankruptcy Code.  (Docket No. 1). The court has previously dismissed Plaintiff's claim under Section 727(a)(5) of the Bankruptcy Code.  (Docket No. 17).

In the instant Chapter 7 case, fourteen proofs of claim have been filed, in the aggregate amount of $1,211,838.58, including a proof of claim filed by the Internal Revenue Service ("IRS") in the amount of $684,502.02.  The total amount of filed claims asserted to be unsecured in the instant Chapter 7 case is $823,658.20.

Prior to the date of filing of the petition in the instant Chapter 7 case, Debtors had a dispute with their homeowners' association, Heron Lakes Estates Owners Association ("Plaintiff").  The dispute resulted in the entry of a judgment, on June 1, 2009, against Debtors, which, <u>inter alia</u>, awarded Plaintiff attorney fees in the amount of $71,804.00. (Plaintiff's Exhibit 95).  Teresa Larsen, the president of Plaintiff's board, testified that Debtors own two homes in the Heron Lakes Estates subdivision in Houston, Texas (one in which they reside, and a second that is under construction), and have

2

at various times owned up to five other lots in the subdivision. Larsen testified that Debtors have made no payments on their assessments for the properties they have owned, and have made no payments under the state court judgment.

By order entered December 31, 2012, the state court appointed a receiver to take possession of Debtors' non-exempt real and personal property. (Plaintiff's Exhibit 65). Herring testified that the appointment of the receiver forced Debtors into bankruptcy. The petition in the instant Chapter 7 case was filed several months later, on May 9, 2013.

Herring is 74 years old, and suffers from heart disease due to blocked artery, heart muscle disorder, and blood clots in lung and vein. The trial was conducted for no more than one hour per day at the request of his doctors. By the end of each hour, Herring seemed tired, and his speech slowed.

On the bankruptcy petition date, Debtors filed, <u>inter alia</u>, schedules of assets, and a statement of financial affairs.

Plaintiffs believe Debtors schedules and statement of financial affairs were so inaccurate as to result in denial of discharge. They addressed the schedules and statement of financial affairs in detail.

<u>Schedules</u>

Debtors' original Schedule B listed Debtors' personal property. Item 9 of Schedule B directed the Debtors to list all

"Interests in insurance policies."  Item 13 of Schedule B directed the Debtors to list all "Stock and interests in incorporated and unincorporated businesses."  Item 14 of Schedule B directed the Debtors to list all "Interests in partnerships or joint ventures."  Item 25 of Schedule B directed the Debtors to list all "Automobiles, trucks, trailers, and other vehicles and accessories."  (Plaintiff's Exhibit 4).

In response to Item 9 of Schedule B, Debtors placed a check in the column marked "None," indicating that they had no insurance policies.  (Plaintiff's Exhibit 4).

Herring testified that he purchased a whole life insurance policy, effective on October 17, 2012, on the life of Dawson.

The insurance policy had a face amount of $961,092, payable on Dawson's death.  There was a minimum cash value of $1,000.  (Plaintiff's Exhibit 86).

Herring testified that the premium for the policy was approximately $3,200 per month.

The insurance policy was not listed on Debtors' original Schedule B.  (Plaintiff's Exhibit 4).

In response to Item 13 of Schedule B, Debtors identified "Theodore M. Herring MD PA," with the statement "**Terminated Oct 1, 2012**.  The property was listed as a community asset, with a value of zero.  (Plaintiff's Exhibit 4).

4

Herring testified that he operated his medical practice through the Theodore M. Herring, Jr. M.D. P.A. (the "PA").  He testified that the PA owned a subsidiary corporation, A Affordable Women's Medical Center, LLC ("AAWMC"), which was formed to provide medical services.  He testified that the PA owned a second subsidiary corporation, A Affordable Counseling Interventions, LLC ("AACI"), which was formed in anticipation of Dawson's providing counseling services.        Herring testified that he attempted to organize a third corporation, to be known as North Houston Women's Medical Center, LLC, in order to hold the lease of the space for the medical practice.  He testified that the name was rejected by the Texas Secretary of State.  He testified that he left the name North Houston Women's Medical Center, LLC in the lease, despite the fact that no such entity was created.

With respect to the indication in Schedule B that the PA was terminated, Herring testified that what Debtors meant was that on the date of termination, the PA ceased filing tax returns.  He testified that the PA entity continued in existence.

Herring testified that, prior to the appointment of a receiver, the PA had maintained a bank account, and he had individually maintained a bank account.  He testified that funds from his medical practice were deposited in part into the PA's bank account, and in part into his personal bank account.

5

He testified that, after the receiver was appointed, he began conducting his medical practice as a sole proprietor, for cash.  He testified that he received cash from his patients, and paid his payroll in cash.  He testified that all the funds he received from operation of his business were paid out for business expenses within a day or two after the payments were received from patients.  He testified that, in order to pay the rent on the office space, he gave cash to Dawson, who then wrote checks from her personal bank account for the office rent and telephone.

Debtors' Schedule I indicated that Debtor had $12,000 per month in income from operation of a sole proprietorship. (Plaintiff's Exhibit 11).

Dawson testified that, with the exception of Plaintiff, Debtors were paying all of their bills as they became due on the bankruptcy petition date.  Herring testified that Debtors were in arrears in the payment of rent on the office space, and in payments to the IRS.  Herring testified that most of Debtors' taxes remain unpaid.

In response to Item 14 of Schedule B, Debtors identified "Theodore M. Herring Family Limited Partnership, CCC," with the statement "Used to invest in properties."  The property was listed as a community asset, with a value of $5,232. (Plaintiff's Exhibit 4).

6

Herring testified that he previously had a family limited partnership during a marriage prior to his marriage to Dawson.  He testified that the first family limited partnership was named the Theodore M. Herring, Jr. Family Limited Partnership (the "First FLP").

Herring testified that he was divorced from his first wife approximately 15 years ago.  He testified that he married Dawson on July 6, 2002.

The entity identified in Item 14 of Debtors' Schedule B is the Theodore M. Herring, Jr. Family Limited Partnership, CCC (the "FLP CCC").  The FLP CCC was formed on June 12, 2003. (Plaintiff's Exhibit 87).  Herring testified that he named it FLP CCC with the designation "CCC" in order to differentiate it from the First FLP.

The Limited Partnership Agreement of the FLP CCC provides that Herring was named the general partner, and provided one percent of the initial capital contribution, and Dawson was named the sole limited partner, and provided 99 percent of the initial capital contribution.  The initial capital contributions are identified on a schedule attached to the Limited Partnership Agreement.  The schedule indicates that the initial capital contribution to the FLP CCC consisted of the sale by Herring of four vehicles to the FLP CCC for $10.  (Plaintiff's Exhibit 87).

Herring testified that three of the four vehicles

7

contributed to the FLP CCC (a 1967 Pontiac Firebird, a 1983 Porsche 944, and a 1985 Honda Civic) were awarded to his children at the time of his divorce from his first wife.[1]  Herring testified that the assets of the First FLP became assets of the FLP CCC.

Herring testified that the FLP CCC now owns a 1973 Rolls Royce Corniche, real property located at 7707 Heron Lakes Drive, and real property located in Michigan.

The court admitted into evidence an appraisal of the Michigan real property.  The uncontroverted value of the property aggregates to $17,000.  (Plaintiff's Exhibit 44).

In response to Item 25 of Schedule B, Debtors identified three vehicles: a 2011 Toyota Camry XLE, which Debtors listed with a value of $18,450; a 2005 Mercedes Benz S430, which Debtors listed with a value of $11,150; and a 1990 Mercedes Benz SL, which Debtors listed with a value of $8,250.  In the column marked "Description and Location of Property," Debtors did not identify a location for any of the vehicles.  (Plaintiff's Exhibit 4).

Herring testified that he owns a 1991 BMW 850i.  He testified that the car is not in running condition.  He testified

---

[1]The court notes that the Limited Partnership Agreement for the FLP CCC was executed on June 12, 2003, approximately eleven months after Herring married Dawson.  Neither the divorce decree between Herring and his first wife, nor the date on which it was entered, is in evidence.

that, after Plaintiff requested that he remove the car from his property, he asked AAA to deliver the car to his son's residence in Galveston, Texas, with instructions that when his son got the car "road-worthy," Herring would transfer title to his son. Herring testified that the car still is not "road-worthy."

The 1991 BMW 850i was not listed in Debtors' original Schedule B, under Item 25 or elsewhere.

Debtors filed an amended Schedule B on June 18, 2013, approximately six weeks after the bankruptcy petition date. Debtors' amended Schedule B filed on June 18, 2013 did not list the insurance policy. It continued to list the PA, with the designation "**Terminated Oct 1, 2012**" and a value of zero. It continued to list the FLP CCC, with a value of $5,232. Debtors' amended Schedule B filed on June 18, 2013 also states, in Item 14, that the FLP CCC owns the 1991 BMW 850i (described in the Schedule as "very old BMW 850i worth about $1,000," the 1973 Rolls Royce Corniche (described in the Schedule as "a non running 25-30 year old Rolls Royce worth about $3,000," the Michigan real property, and real property designated as "0 Heron Lakes Drive."[2] (Plaintiff's Exhibit 17).

On May 5, 2014, approximately seven months after the date of filing of the complaint in the instant adversary

---

[2]Dawson testified that the property identified as 0 Heron Lakes is a strip of land adjacent to a lake owned by the developer of the Heron Lakes Estates subdivision.

proceeding, Debtors filed their second amended Schedule B.
Debtors' second amended Schedule B filed on May 5, 2014 discloses
the existence of the insurance policy, but reflects that it has
no cash value.  Debtors' second amended Schedule B filed on May
5, 2014 states, with respect to the PA, "Debtor incorrectly
believed at the time of filing that this entity's existence had
been terminated." (Plaintiff's Exhibit 19).

On May 27, 2014, Debtors filed their third amended
Schedule B.  In their third amended Schedule B filed on May 24,
2014, Debtors disclosed that the insurance policy covered the
life of Dawson, and that the beneficiary was Herring.  Debtors
continued to assert that the policy had no cash value.  Debtors
disclosed additional assets that previously had not been
disclosed, including a riding mower and other lawn equipment, a
camera, three laptop computers, and construction materials not
yet incorporated into the house under construction. (Plaintiff's
Exhibit 23).

## Statement of Financial Affairs

Debtors' statement of financial affairs required
disclosures about Debtors' financial condition on the bankruptcy
petition date.  Item 1 of the statement of financial affairs
directed the Debtors to state their income from employment or
operation of business.  Item 3 of the statement of financial
affairs directed the Debtors to disclose payments to creditors

10

within the 90 day period prior to the bankruptcy petition date. Item 7 of the statement of financial affairs directed Debtors to identify any gifts made within the one year period prior to the bankruptcy petition date. Item 18 of the statement of financial affairs directed Debtors to disclose "the names, addresses, taxpayer-identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time within SIX YEARS immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within SIX YEARS immediately preceding the commencement of this case." (Plaintiff's Exhibit 13).

In response to Item 1 of the statement of financial affairs, Debtors identified income of $157,811 for 2011, $90,434 for 2012, and $48,795 from the beginning of 2013 through the bankruptcy petition date of May 9, 2013. (Plaintiff's Exhibit 13).

Herring testified that the PA had income of at least $200,000 per year, prior to the bankruptcy petition date in the instant case. He testified that he had personal income at an annual rate of $96,000 per year.

In response to discovery requests, Debtors produced documents purporting to be the payroll records of the medical practice.  The documents are handwritten, and bear dates beginning on June 1, 2012, and continuing weekly through June 14, 2013, a date several weeks after the bankruptcy petition date. (Plaintiff's Exhibit 61).  Herring testified that Debtors kept no other financial records regarding the medical practice.  He testified that the medical practice did not withhold taxes from the payroll, and did not issue forms W-2 or 1099 to the individuals working in the medical practice.

Herring testified that he paid the expenses of the business in cash, and kept no records of these payments other than handwritten notations as to the payments to the individuals working in the medical practice.

The court finds that Herring operated the medical practice as a sole proprietorship after October 1, 2012.[3]

In response to Item 3 of the statement of financial affairs, Debtors identified payments to Wells Fargo Home Mortgage, Bank of America, N.A., BBVA Compass, BBT, and Toyota Financial Services.  (Plaintiff's Exhibit 13).

Herring testified that he made payments to the landlord

_____

[3]Debtor did not disclose all of the income he received as a sole proprietor on Item 1 of the statement of financial affairs. However, he also did not disclose the expenses of the business in his statement of financial affairs.  The court does not infer intent to defraud from these omissions.

12

of the medical practice by giving cash to Dawson, and having Dawson write checks to the landlord out of her personal bank account.  These payments were payments of debts of the sole proprietorship of Herring.  They were not disclosed on Item 3 of the statement of financial affairs.

In response to Item 7 of the statement of financial affairs, Debtors identified gifts to "SDA Church," Star of Hope, and the Salvation Army.  (Plaintiff's Exhibit 13).

Debtors did not identify a transfer of the BMW 850i as a gift to Herring's son on Item 7 of the statement of financial affairs.

Dawson testified that the line item listing "SDA Church," with an address of 2390 W. Sam Houston Pkwy, Houston, Texas, actually identified gifts to six different Seventh Day Adventist churches located in the Houston area.  Dawson testified that the church listed was the West Houston Seventh Day Adventist Church.  She testified that she was not a member of that church in 2012, but did attend that church.

In response to Item 18 of the statement of financial affairs, Debtors identified "Theodore M. Herring Jr.", a medical services business with dates of "1980 to Present"; Theodore M. Herring Jr. MD PA, a medical services business with dates of "Nov 26, 1985 to Oct 1, 2012"; Theodore M. Herring Jr. Family Limited Partnership, with the nature of the business identified as

"Investments," and no beginning or ending dates identified; and Aafordable Counseling Interventions, LLC, a counseling services business, with dates of "11-2011 to Current." (Plaintiff's Exhibit 13).

<u>Conclusions of Law</u>

Section 727(a) of the Bankruptcy Code provides in pertinent part:

(a) The court shall grant the debtor a discharge, unless--

* * *

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed -

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case -

(A) made a false oath or account;

(B) presented or used a false claim;

14

> (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
>
> (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

11 U.S.C. § 727(a).

Intent to defraud may be inferred from the actions of the debtors and may be proven by circumstantial evidence. <u>Pavy v. Chastant (In re Chastant)</u>, 873 F.3d 89 (5th Cir. 1989).

At the time this adversary proceeding went to trial, Debtors' original counsel had retired from practice but had participated in assisting with the Debtors' schedules and the various amendments.[4]

There were without doubt inaccuracies in Debtors' original schedules. These were addressed over time in various amendments. It is Plaintiff's position that these various amendments were too little and too late, but the question for the court is whether to infer an intent to defraud from the presentation of the schedules and the subsequent amendments. The

---

[4]Herring frequently referred at trial of the instant adversary proceeding to his previous counsel. He was respectful in speaking of her. He appears to have relied on her. The court concludes she did not confer with, and advise, her clients sufficiently to obtain a complete understanding of their complex finances, in her assistance with the preparation of the original and first and second amended schedules and statement of financial affairs.

Debtors' affairs were complex, and required considerable advice from counsel with regard to how to present Debtors' financial profile in the form of schedules and a statement of financial affairs.

The court finds that Dawson's testimony was of little weight, as she testified that she did not know much of the information sought in questions that were addressed to her in court.  The court finds that Herring's testimony was credible.  The court concludes that Debtors did not intend to defraud creditors in presenting the information they presented in the schedules and statement of financial affairs regarding the property of the Debtors.  The court concludes that the relief sought under Section 727(a)(2) should be denied.

Section 727(a)(3) of the Bankruptcy Code provides for denial of discharge if (1) the debtor fails to keep or preserve financial records, and (2) the failure makes it impossible for the creditor to discern the debtor's financial condition. The creditor has the initial burden to prove both (1) and (2).  Once the creditor adduces relevant evidence establishing (1) and (2), the burden shifts to the debtor to show that the failure to keep records was justified under the circumstances.  In re Buescher, 783 F.3d 302 (5th Cir. 2015), citing Robertson v. Dennis (In re Dennis), 330 F.3d 696 (5th Cir. 2003).

The level of the debtor's sophistication and extent of

16

his business activities bear on the adequacy of his record keeping.  In re Womble, 108 Fed. Appx. 993 (5th Cir. 2004), citing Goff v. Russell Co. (In re Goff), 495 F.2d 199 (5th Cir. 1974).  Discharge should be denied only for very specific and serious infractions.  In re Pfeifle, 154 Fed. Appx. 432 (5th Cir. 2005), citing In re Ichinose, 946 F.2d 1169 (5th Cir. 1991)

        The justification inquiry should include the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to the debtor in his business; and any other circumstances that should be considered in the interest of justice.  In re Womble, 108 Fed. Appx. 993 (5th Cir. 2004).

        With respect to the instant case, Debtors' records were without doubt poor after October, 2012.  However, the Debtors, although educated, are not particularly sophisticated in financial matters.  There is no evidence that Debtors destroyed or concealed any records.  Debtors' poor record-keeping, standing alone, is not an infraction so serious as to be sufficient to deny discharge.

        To prevail under Section 727(a)(4) of the Bankruptcy Code, the Plaintiff must prove by a preponderance of the evidence that (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false;

17

(4) the debtor made the statement with fraudulent intent; and (5) the statement was material to the bankruptcy case.  <u>In re Duncan</u>, 562 F.3d 688 (5th Cir. 2009).

In the instant case, Debtors's schedules and statement of financial affairs contained numerous inaccurate and incomplete statements.  However, as addressed above, the court does not find that Debtors made those statements with fraudulent intent, in light of the complexity of Debtors' finances and what appear to have been errors made by their former counsel in assisting in preparation of the documents.  The court concludes that the relief sought pursuant to Section 727(a)(4) should be denied.

Based on the foregoing, a separate Judgment will be entered denying the relief sought by the Plaintiff.

Signed at Houston, Texas on August 26, 2015.


LETITIA Z. PAUL
UNITED STATES BANKRUPTCY JUDGE